UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | : | |
| *ex rel.* [UNDER SEAL], | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: |
| | : | |
| v. | : | |
| | : | |
| [UNDER SEAL], | : | |
| | : | |
| Defendants. | : | |

## QUI TAM COMPLAINT

**FILED IN CAMERA AND UNDER SEAL
UNDER 31 U.S.C. § 3730(b)(2)**

**NOT TO BE ENTERED IN PACER**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | : | |
| *ex rel.* HADRON INDUSTRIES, INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: |
| | : | |
| v. | : | |
| | : | |
| TRIANGLE EXPERIENCE GROUP, INC. | : | |
| ALQIMI ANALYTICS & | : | |
| INTELLIGENCE, LLC, | : | |
| ROBERT E. CLARE, JR., | : | **FILED UNDER SEAL** |
| and SEAN McCLUSKEY, | : | |
| | : | |
| Defendants. | : | |

## QUI TAM COMPLAINT

The United States of America *ex rel.* Plaintiff Hadron Industries, Inc., alleges for its

Complaint against the defendants as follows:

## NATURE OF THE ACTION

1.     This is an action to recover damages and civil penalties on behalf of the United

States of America under the Federal False Claims Act, 31 U.S.C. §§ 3729 - 3733 ("FCA"),

against Defendants Triangle Experience Group, Inc., ALQIMI Analytics & Intelligence, LLC,

Robert E. Clare, Jr., and Sean McCluskey (collectively "Defendants").

2.     Defendants have been engaged in a scheme to knowingly submit, or cause to be

submitted, false claims for payment to the United States by knowingly submitting invoices for

goods and services not delivered, exaggerating the numbers of hours actually worked, inflating

the qualifications of contract performers in order to bill them at higher hourly rates, knowingly supplying sub-par goods to the United States, billing the same work against simultaneous federal contracts, and making numerous false statements to the Government to justify their false invoices.

3.      Defendants have knowingly submitted a number of invoices for payment for goods and services not delivered, and have made numerous false statements to Government officials in justification of these invoices.

4.      These invoices and false statements were made during the performance of various federally funded research and development contracts.  The primary Government targets of these falsehoods have been the National Reconnaissance Office and United States Air Force Intelligence, Surveillance and Reconnaissance Innovations.

5.      Defendants Triangle Experience Group, Inc., Robert E. Clare, Jr., and Sean McCluskey (collectively "TEG Defendants") knowingly misrepresented their qualifications to build, and have attempted to deliver, a product that safeguards the lives of service members and intelligence assets.  TEG Defendants were aware that their faulty product posed life-threatening danger to its users and concealed this fact from the Government in order to obtain a contract. The primary Government targets of these falsehoods have been the National Reconnaissance Office and Joint Special Operations Command.  TEG Defendants' performance on this fraudulently obtained contract is ongoing.

6.      Through their fraudulent acts, Defendants have defrauded the United States out of tens of millions of dollars.

7.      Defendants' conduct alleged herein violates the FCA.

## **PARTIES**

8.      *Qui tam* Plaintiff and Relator Hadron Industries, Inc. ("Relator" or "Hadron") is a New Hampshire corporation with a principal place of business in Cambridge, Massachusetts.

9.      Relator is a Service-Disabled Veteran-Owned Small Business ("SDVOSB") software development firm that designs and sells custom computer software and hardware systems focused on enhancing communication, security, and situational awareness for the United States Department of Defense ("DoD").

10.      Relator was founded in 2010 by Klee Dienes ("Dienes"), a software engineer and former senior engineer at Apple Inc. with Bachelor of Science and Master of Science degrees from the Massachusetts Institute of Technology.  Dienes previously served as team leader and helicopter pilot for a deployed company in southeastern Iraq, and currently serves as a defensive cyberoperations officer in the United States Army National Guard.

11.      All information and allegations set forth herein are based on Relator's direct and independent knowledge as a result of its direct business dealings and interactions with Defendants.  The information and evidence upon which the allegations are based were obtained directly by Relator independently and through its own labor and efforts.  This action is not based on any public disclosure.

12.      The United States, on whose behalf Relator brings suit, is the real party in interest.  The United States has had or has ongoing contracts with Defendants through which false and fraudulent claims have been paid.

13.      Defendant Triangle Experience Group, Inc. ("TEG"), upon information and belief, is a Virginia corporation with a principal place of business in Arlington, Virginia.

3

14.     Defendant ALQIMI Analytics & Intelligence, LLC ("AAI"), upon information and belief, is a Delaware limited liability company with a principal place of business in Rockville, Maryland.  Upon information and belief, AAI is wholly owned by member ALQIMI Technology Solutions, Inc., a Maryland corporation with a principal place of business at the same place of business in Rockville, Maryland.

15.     Defendant Robert E. Clare, Jr. ("Clare"), is an individual who, upon information and belief, is a citizen of the Commonwealth of Virginia.  Clare is the President and Chief Executive Officer of TEG.

16.     Clare founded TEG in 2010 to provide tactical training services and experiences such as basic jungle warfare skills, jungle tracking school, explosive breaching, and long distance marksman training.  Upon information and belief Clare began marketing TEG as a technology services provider in and around 2012.

17.     Defendant Sean McCluskey ("McCluskey") is an individual who, upon information and belief, is a citizen of Maryland.  McCluskey is Managing General Partner of TEG.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

19.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) as Defendants transact business within and have committed acts related to the allegations in the Complaint in the District of Massachusetts.

4

20.     Venue is proper pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to these claims occurred in the District of Massachusetts.

## BACKGROUND FACTS

### I.     Hadron's Development of ACES

21.     From 2011 to 2013, Hadron conducted federally funded research as part of the government's Small Business Innovation Research ("SBIR") program, a highly competitive awards-based program that encourages domestic small businesses to engage in federal research and development that has the potential for commercialization.  Specifically, Hadron researched and developed new, innovative, and advanced technologies for collaborative computing, spatial computing, and shared situational awareness applications for the DoD.

22.     Extending its work with the SBIR program, Hadron independently developed two proprietary software products as a result of its SBIR related work:  Praxis™, a framework for gestural input and spatial computing; and Photon™, a software platform that permits users within an organization to share the contents of their display(s) with any other display(s) in the organization.

23.     The United States Air Force ("USAF") Intelligence, Surveillance and Reconnaissance Innovations ("A2I"), the technology investment program office of the USAF, tasked the federal program Advanced Collaborative Enterprise Services ("ACES") in early 2013 to evaluate possible solutions that would allow for multi-site collaboration of shared data and information.

24.     Over the course of 2013, various approaches to collaboration through the ACES program were reviewed and evaluated by the Government.  One such approach was technology

5

from Oblong Industries, Inc. ("Oblong Industries"), relating to the movement of data around a six display environment with the use of manual gestures.  However, Oblong Industries' product, Mezzanine, was designed for conference room use and unsuitable to accommodate larger environments common to the DoD, such as operations centers.

25.     In the fall of 2013, A2I approached Hadron about the Government's need for smoother collaboration capabilities among and between mission planners and intelligence analysts.  Hadron, in response, offered a unique approach and vision for ACES: a system that would turn all of an organization's screens and input devices into a single, unified, collaborative workspace that could be shared between all users across large distances, in which a given user may allow any other user or users to see what he or she sees in real time, even users separated by geography and security domains.

26.     The USAF approved of Hadron's vision for ACES and, on or about July 31, 2014, the USAF awarded Hadron a Phase III SBIR contract to develop this ACES platform, Contract Number FA8650-14-D-6533.  Pursuant to the Phase III SBIR contract, Hadron was responsible for researching and developing all of the core software of the ACES operating environment, including the computer system environment, data movement functionality, integration work, and physical equipment.

27.     As a Phase III SBIR contractor, Hadron had certain rights and privileges, including the right to sell SBIR-based products to the Government on a sole source basis and the privilege of being the Government's preferred vendor of such products.

28.     In accordance with the Phase III SBIR contract, Hadron developed the ACES software platform.  Hadron's proprietary software, Photon™ and Praxis™, are the foundation of the ACES system.

A. **Hadron's Introduction to TEG Defendants**

29.     A2I works as a type of investment channel for new technologies with DoD applications.  When an agency within the DoD wishes to test a prototype capability in A2I's portfolio, A2I will support the acquisition by providing additional federal funding.  Typically, for an A2I technology to be brought to market and widely deployed throughout DoD, it is critical to identify these early adopters of the technology and to establish a proper funding structure.  Such funding allows the vendor responsible for developing the technology to continue developing its prototype into a stable, operations-ready product that will benefit the Government.

30.     To this end, in and around late 2013, A2I, through the ACES program manager, advised Hadron to engage Clare for the continued purpose of facilitating the relationship between Hadron and A2I.  At the time, Clare held himself out as a Systems, Engineering and Technical Assistance ("SETA") contractor with A2I in addition to his role as President of TEG.

31.     As a SETA contractor, Clare was to provide consulting services to A2I to assist with USAF requirements for the ACES program, such as providing objective innovation and investment guidance, assessments of DoD needs, and vendor capabilities.

32.     SETA contractors, like Clare, generally work closely with the Government's own engineering staff members and often assist the Government with, inter alia, developing work statements and determining specifications and system parameters.  Pursuant to the USAF's directive, Hadron interacted with A2I, in part, through Clare.

B. **AAI's Introduction to ACES**

33.     As the systems integrator of ACES and in connection with its SBIR contracts, Hadron was to deliver and install a Praxis™ based 6-axis gestural control system, a 6-display

immersive video environment, and a Photon™ based window control system in a facility that could be easily accessed by Government personnel.

34.    Hadron was also required to integrate various mission-oriented analytical tools into Hadron's ACES system.  Such tools, provided by third parties, were intended to allow USAF personnel to demonstrate the utility of ACES to other Government staff using real-world scenarios.

35.    Clare, during his time as a SETA contractor and ostensibly acting on behalf of the A2I office, recommended AAI to Hadron as a potential third party software firm to provide analytical tools for this purpose.  Specifically, AAI offered the Social Insight Fusion Toolkit ("SIFT"), a web-based application used for gathering and filtering intelligence from social media sources.

36.    As part of AAI's prospective engagement by Hadron, a mutual non-disclosure agreement was executed and, in or about February 2014, Walter Greenberg ("Greenberg") traveled to Hadron's office, located in Boston, Massachusetts at the time, to attend a Hadron product demonstration.  Upon information and belief, at the time, Greenberg was a managing member and President of GT Solutions, LLC, predecessor of AAI, and AAI's Chief Technology Officer.

37.    Hadron's demonstration to AAI included an overview of the ACES program goals and technology, as well as a demonstration of Hadron's proprietary Photon™ software interacting with Mezzanine, the software that had been previously considered, but ultimately rejected, by the Government for the ACES core technology prior to selecting Hadron's software products.  AAI also demonstrated its SIFT technology.

8

38.     The demonstration at Hadron's Boston office was AAI's first exposure to Hadron's ACES technology.

### C.     Hadron's Resulting Business Relationship with TEG

39.     Clare departed his position with A2I and began working full time as CEO of TEG in and around August 2014.

40.     Given the complementary nature of Hadron's engineering skills and TEG's contacts in the defense industry through Clare, Hadron and TEG entered into an agreement in and around August 2014 whereby TEG, which had little technical experience, would identify prospective early adopters of Hadron's ACES technology and software platform within the DoD. This would involve arranging demonstrations of ACES with these prospective customers, gathering requirements for additional task orders on Hadron's Phase III SBIR contract, and coordinating acquisition efforts between customers, Hadron, and A2I.

41.     TEG's primary venue for attracting ACES investments was the Government funded ACES development and demonstration laboratory located in Rosslyn, Virginia (the "ACES Rosslyn Lab").  The ACES Rosslyn Lab includes over 30 large wall-mounted displays, six workstations, and a video teleconferencing system.  All the technology capability on display in the ACES Rosslyn Lab, such as video walls, an infrared motion capture system, and analyst workstations, was designed and built by Hadron.

42.     As with the ACES Rosslyn Lab, Hadron designed and built a similar such demonstration space for A2I at the University of Nebraska-Omaha ("UNO"), which is affiliated with United States Strategic Command ("STRATCOM").  The May 2015 proposal submitted by TEG for this work acutely illustrated TEG's role as an interface between Hadron and Hadron's

ME1 26640029v.1

customers.  TEG's proposal further acknowledged Hadron's propriety software, Photon™, as the foundation of ACES and that Hadron would perform the engineering effort.

## II.   Defendants' Fraud Against the United States

### A.   End of Year Contract

43.     In or about March 2014, while awaiting completion of the final Phase III SBIR contract award to Hadron, the USAF began preparations for an additional ACES development contract using approximately $3,200,000.00 in end-of-year ("EOY") funds for ACES development in late 2014 and 2015.  USAF staff met and made tentative allocations of the funds and, in keeping with Hadron's status as the systems integrator for ACES, the USAF intended that Hadron be the system architect and project coordinator for the EOY contract.  As part of its planning, Clare, ostensibly acting on behalf of the A2I office, requested that Hadron draft a statement of work for the EOY contract, including a feature roadmap for 2015.

44.     In or about April 2014, Hadron provided a proprietary, draft statement of work to Clare for the Government as requested.  In the statement of work, Hadron proposed to, inter alia, design, deliver, install, and customize a single ACES prototype for research and development use by the USAF containing all required Praxis™ and Photon™ software, and to further develop and enhance the ACES platform beyond the work to be performed under Hadron's Phase III SBIR contract.

45.     In or about May 2014, the USAF issued a formal Statement of Work ("SOW") for the new EOY contract, and sought deliverables highly similar to those set forth in the draft language in the statement of work that was requested of and provided by Hadron to Clare.

46.     The SOW specifically required the design, delivery, installation, and customization of an ACES operating environment ("ACES-OE") for research and development

10

use at A2I's office.  The ACES-OE was to include, inter alia, "all required Praxis™ and Photon™ software required to support several representative applications" and required the contractor to "improve core Photon™ functions."

47.    The SOW also called for a series of highly technical network engineering and systems engineering tasks, including improvements to networking protocols.  It further required the performance of "integration and implementation support" tasks which generally required the performer to provide maintenance, rapid prototyping, and troubleshooting to current and prospective early adopters of ACES.

48.    Unbeknownst to Hadron, AAI submitted a technical proposal to the SOW as a task order under the Eagle Intelligence Express 3 vehicle, Contract Number W911QY-13-D-0100, with prime contractor PAR Government Systems Corporation ("PARGov").  In it, AAI falsely claimed that it would be working in conjunction with Hadron to deliver the Government's requirements.

49.    AAI's proposal included many verbatim phrases that originally appeared in Hadron's proprietary, draft statement of work prepared for the Government.  Unbeknownst to Hadron, Defendants combined together for the shared purpose of improperly using Hadron's proprietary information and Hadron's experience and qualifications for purposes of securing the Government's award and for purposes of misrepresenting their capabilities to the Government.

50.    Clare shared Hadron's proprietary documents with AAI for purposes of AAI itself bidding on the SOW.  Clare would use his influence as an A2I SETA contractor to award the contract to AAI, and AAI would, in turn, outsource a great deal of the EOY contract's deliverables to Clare's company, TEG.

51.     The majority of the SOW comprised of tasks directly related to ACES system delivery, engineering, and maintenance.  AAI's proposal estimated approximately 9,400 labor hours for these tasks and approximately 3,100 hours for remaining tasks combined.

52.     In its proposal, AAI knowingly misrepresented its technical expertise and falsely claimed it had specific technical expertise that was actually properly attributable to Hadron.  AAI knowingly misled the Government as to its qualifications by representing it was "in a unique position from both a technical and management perspective" to meet the requirements of the SOW based on its previous experience and program successes in relation to the satisfying the ACES-OE task order.  Contrary to its assertions, however, AAI's only exposure to Hadron's ACES technology up until that point had been Hadron's demonstration that AAI attended at Hadron's Boston office.

53.     On or about July 1, 2014, the Government issued a favorable technical evaluation of AAI's proposal based on AAI's misrepresentations that AAI would be using Hadron's proprietary software and relying on Hadron for technical performance.  The Government expressly referred to Hadron's intimate understanding of the Government's needs and to Hadron's Praxis™ and Photon™ software products and their necessity to the contract.

54.     Hadron has never licensed its Praxis™ or Photon™ proprietary software to AAI or TEG.

55.     In its technical evaluation, the Government recommended award of the EOY contract to AAI based on the proposal description, personnel to be involved, and having the requisite engineering qualifications to deliver the ACES-OE.

56.     Following the Government's award decision, AAI submitted a revised technical proposal that did not reference Hadron and Hadron's Praxis™ and Photon™ software products.

Instead, the revised technical proposal contained references to Oblong Industries and its Mezzanine software product.

57.     The Government's technical evaluation made no mention of Oblong Industries or use of its Mezzanine software.

58.     At the time, McCluskey and Clare both worked for Oblong Industries, provider of the Mezzanine product.

59.     As a result of Defendants' misrepresentations to the Government, AAI, through its prime contractor, was awarded the EOY contract for fixed price of $3,093,948.20 on or about July 16, 2014.  Through its deception, AAI improperly obtained this award despite lacking the technical background to fulfill the contract's deliverables and having no means to provide access to the ACES technology owned by Hadron.

60.     In accordance with their scheme, on or about August 4, 2014, AAI subcontracted TEG for $819,000 worth of services in connection with the EOY contract, Subcontract Number AAI-SC-2014-TEG-001, including the design, delivery, installation, and customization of an ACES-OE prototype and for spatial computing support and customized application development.

61.     The only labor category for the work to be performed under AAI's subcontract to TEG was filled by McCluskey who, at the time, was actually the Director of federal sales for Oblong Industries.  In January 2015, McCluskey became Managing General Partner of TEG. However, as McCluskey is not an engineer, upon information and belief, he performed no engineering labor under this subcontract.

### a.     Defendants' Inability and Failure to Deliver Under the EOY Contract

62.     As part of the deliverable for the EOY contract, AAI was allotted federal funds under the EOY contract to lease office space for a demonstration laboratory for ACES and A2I

13

personnel (the "ACES A2I Lab").  While AAI leased and administered the space, A2I maintained operational control of the ACES A2I Lab.

63.     At or around the time of the award of the EOY contract, Hadron was performing its own SBIR contract to similarly deliver and install a Praxis™ and Photon™ based ACES-OE system in a facility that could be easily accessed by Government personnel.

64.     Given that A2I serves a product marketing role for its portfolio of investments, and because AAI's and Hadron's contracts both required the performance of ACES demonstrations for Government audiences, A2I directed AAI and Hadron to perform their respective contracts in that same office space.  TEG was a subcontractor to both AAI and Hadron.

65.     Within weeks, the technology capability Hadron designed and built in the ACES A2I Lab, such as video walls, an infrared motion tracking system, and analyst workstations, was being used to provide demonstrations to multiple Government audiences on a weekly basis, attracting attention from high-profile Government customers.

66.     Hadron went on to integrate and deliver an ACES-OE beyond the ACES A2I Lab into the Army Geospatial Center ("AGC"), Wright-Patterson Air Force Base ("WPAFB"), and UNO.  These installations were funded by Hadron's Government contract and, in some cases to cover cost overages, by Hadron's private funds.

67.     In contrast, as of December 2014, AAI's area of the ACES A2I Lab featured just three displays and no gestural tracking system.  During Hadron's time at the ACES A2I Lab, Hadron's own gestural tracking system was the only such system present.

68.     As part of its SBIR contract, Hadron was also required to integrate various mission-oriented analytical tools into Hadron's ACES system, which requirement had initially

occasioned Clare's recommendation of AAI and led to the meeting with AAI in Hadron's Boston office in early 2014.

69.     To this end, Hadron integrated SIFT into its ACES-OE at the ACES A2I Lab. SIFT was stored in a Georgia data center and was accessed remotely.  The incorporation of the SIFT software into Hadron's ACES-OE allowed AAI to use Hadron's equipment to demonstrate SIFT.

70.     Unbeknownst to Hadron, however, AAI improperly claimed and misrepresented Hadron's achievements as its own to Government personnel.  AAI's Chief Technology Officer, Greenberg, misrepresented himself as the lead architect and integrator for ACES.

71.     In and around December 2014, the A2I office directed Hadron to move its ACES-OE installation from the ACES A2I Lab to another location.  As AAI had failed to make any meaningful progress on its own ACES-OE deliverables, the resulting removal and transfer of Hadron's technology left the ACES A2I Lab largely bare and left AAI with no ability to demonstrate ACES capabilities.

72.     When Hadron removed its ACES-OE from the ACES A2I Lab per the Government's direction, AAI was left with no means to properly demonstrate the ACES technology that it was required to deliver under the EOY contract and for which AAI likely had already invoiced the Government.

73.     In order to conceal and obfuscate the fact that AAI was incapable of and failed to deliver an ACES-OE under the EOY contract, AAI, through several of its staff including its Chief Technology Officer, Senior Program Manager, and Senior Software Engineer, approached the Federal Bureau of Investigation ("FBI") to intentionally and knowingly assert false accusations against Hadron, and specifically Dienes.

74.     AAI knowingly and falsely accused Dienes of interfering with AAI's work as a prime contractor for ACES by unlawfully accessing the ACES A2I Lab, copying AAI's proprietary software onto his own equipment, and destroying AAI's hardware.

75.     As a direct result of these false statements made to the FBI, Dienes was arrested in June 2016.  However, just two days after providing the FBI and Assistant United States Attorney with truthful and exculpatory information evidencing the falsity of AAI's accusations, the Department of Justice ("DOJ") moved to dismiss the case against Dienes.  The case against Dienes was dismissed in its entirety.

####     b.     Fraudulent Invoices Submitted to the Government Under the EOY Contract

76.     During the same period of time of its subcontract with AAI, TEG was also a subcontractor to Hadron's SBIR contract.  Thus, TEG had subcontracts with two prime contractors to provide highly similar services at the same location during an overlapping timeframe.  TEG Defendants used the simultaneity and collocation of these subcontracts to bill TEG's prime contractors twice for the same labor.

77.     On December 14, 2014, McCluskey submitted an invoice to AAI for the month of November 2014, indicating that TEG delivered an ACES-OE at the AGC.  In its invoice, TEG sought payment for 320 hours of worked performed during a two week period at the AGC.  However, the work for which TEG sought payment was actually Hadron's ACES-OE installation at AGC.  TEG provided only marginal assistance to Hadron in connection with the AGC installation, for which work TEG invoiced Hadron.

78.     This TEG invoice to AAI was initially rejected because TEG billed hours to a non-existent contract line item number ("CLIN").  However, TEG's final activity report to AAI

claimed delivery of an ACES-OE to the AGC, indicating that TEG Defendants resubmitted the fraudulent invoice using an existing CLIN.

79.    TEG's final report, included in the Contract Data Requirements List of the award, was required to document all activities accomplished and summarize the results of all work performed, deliverables completed, problems encountered, and recommended solutions to unresolved issues.

80.    Despite Defendants' inability and failure to deliver under the EOY contract, TEG's final activity report to AAI falsely identified five "completed" ACES installations:  (1) AGC; (2) STRATCOM; (3) Joint Special Operations Command ("JSOC"); (4) WPAFB; and (5) Amy National Guard Cyber Operations Center.

81.    Contrary to TEG's final report, the installations at the AGC and WPAFB were actually performed by Hadron and were funded by Hadron's own Government contract, not by the EOY contract awarded to AAI.

82.    Further, no ACES installation has ever been installed at STRATCOM.  Rather, this claimed installation is likely a reference to the installation at UNO, which was also performed entirely by Hadron and funded by Hadron's federal contracts.

83.    With respect to the claimed installation at JSOC, no ACES system was installed at JSOC during the time of TEG's subcontract with AAI.  Rather, TEG accompanied Hadron to a JSOC facility to provide support for a non-ACES system, the travel for which TEG billed to Hadron.

84.    Finally, the entity "Amy National Guard Cyber Operations Center" does not exist. This is likely a reference to the New Hampshire Army National Guard Joint Operations Center

where Hadron, not TEG, installed an ACES system with Hadron's own staff, equipment, and private funds.

85.     Defendants knowingly fabricated these deliverables, passed off Hadron's work as their own, and invoiced the Government for work they never performed and for installations they never provided to the Government.

86.     In addition, AAI's cost proposal to the SOW allotted $971,190.00 to "integration and implementation support."  However, Hadron observed no work performed on such tasks while working in the ACES A2I Lab with AAI.

87.     Similarly, AAI's cost proposal allotted $126,636.00 of labor costs to cinematic-based marketing for the ACES project to describe the overall capabilities and utility of ACES, which AAI failed to deliver.  In late January 2015, Clare confirmed to Hadron that AAI had not made any progress on this task and, soon afterwards, A2I requested Hadron to assume this task.

88.     Also in its final activity report to AAI, TEG further falsely claimed to have deployed the first ACES-OE in a Government sponsored laboratory setting, which statement AAI also knew to be false.  This reference was to the ACES-OE installed by Hadron, the hardware and labor for which were funded by Hadron's own prime contracts.  TEG provided only marginal support to Hadron in this effort, for which work TEG invoiced Hadron.

89.     TEG Defendants knew of the falsity of these claimed deliverables, misrepresented the status of TEG's subcontract as 100% complete, and submitted invoices for payment for labor and deliverables totaling $783,000.00 that TEG did not provide, and another $36,000.00 in travel costs.

90.     AAI knew of the falsity of these claimed deliverables, yet facilitated the payment of TEG's subcontractor invoices using federal funds under the EOY contract.

18

B.      **National Reconnaissance Office**

91.     From August 2015 through August 2016, Hadron worked to install an ACES deployment for the National Reconnaissance Office ("NRO").  During this time, TEG was ostensibly providing sales, marketing, and field services for Hadron's ACES technology in accordance with the parties' agreement.

92.     Instead, TEG Defendants used Clare's influence with A2I and contract offices and customers within the DoD to mislead the Government and make TEG, rather than Hadron, the prime contractor on various acquisitions, claiming in its bid proposals that it had partnered with Hadron to deliver software, hardware, and engineering services.

93.     Ultimately, TEG knowingly misrepresented Hadron's intellectual property as its own in various bid proposals submitted to the Government.  TEG Defendants further knowingly delivered defective goods to the Government and invoiced the Government for payment.

   a.   **TEG Defendants Knowingly Delivered Defective Goods to the Government**

94.     In or about June 2015, TEG submitted a proposal for services to deliver an ACES-OE to the NRO through PARGov's prime Contract Number W911QY-13-D-0100.  In its proposal TEG acknowledged and stated that the ACES-OE was governed by Hadron's Phase III SBIR contract to develop this ACES platform.

95.     In an effort to influence and accelerate an award, on or about June 17, 2015, McCluskey misrepresented to the Government that additional funding was "definitely needed" because Hadron hired four additional engineers "to help accelerate the build."  McCluskey's statement was knowingly false as Hadron had not hired any new personnel at this time.

96.     In or about September 2015, TEG submitted a price proposal for the contract, which called for eight full time equivalent personnel ("FTE"), including three spatial computing

engineers at a rate of $182.00 per hour for a total of $855,400.00.  However, TEG did not have any spatial computing engineers.  Rather, all spatial computing engineering labor available to TEG was from Hadron staff.  At this time, however, TEG did not engage Hadron further to subcontract their services for this NRO project, thus misleading the Government as to its ability to deliver the services set forth in its proposal.

97.     On or about October 1, 2015, TEG was awarded the task order, Subcontract Number SC-111756-100, with a ceiling of $2,673,000.00.

98.     On or about October 26, 2015, the contract was modified to shorten its term from 12 to nine months but with the same ceiling and FTE, effectively increasing TEG's labor rates by 33%.

99.     In or about September 2016, one deliverable to install several systems for an NRO project referred to as "SITROOM" remained.  While the systems destined for the SITROOM had been built, they were not functioning properly.  Hadron repeatedly made TEG aware of these problems and put TEG on notice that the systems were not technically fit for shipment to the NRO.

100.    Notwithstanding its knowledge of the defective state of these nonfunctioning systems, TEG Defendants delivered them to the NRO.  TEG had already fraudulently invoiced the Government for the defective goods prior to their delivery.

**b.    Fraudulent Invoices Submitted to the Government**

101.    In or about July 2016, TEG began providing services for the NRO under a new subcontract, AMCOM Express, W31P4Q-05-A-0031-0033, with prime contractor Science Applications International Corporation ("SAIC").  Under this subcontract, TEG was forbidden from subcontracting any labor.  However, TEG knowingly billed hours for two individuals,

Frank Tanner and Don Engel, who were functioning as subcontractors in violation of the subcontract.

102.    TEG improperly listed both Mr. Tanner and Mr. Engel as performers for the SAIC contract on a labor rate sheet TEG prepared in April 2016 despite their lack of employee status.

103.    Frank Tanner, a Hadron employee, worked out of shared office space with TEG where Mr. Tanner provided technical support for TEG's demonstrations of Hadron's products. Neither Hadron nor Mr. Tanner individually entered into any contract with TEG for his services.

104.    Notwithstanding, in or about July and August 2016, McCluskey directed Mr. Tanner to begin charging "100% of your working day" to the SAIC contract, regardless of how his time was actually spent.

105.    When Mr. Tanner responded that he performed work unrelated to the SAIC contract, McCluskey was dismissive and responded that Mr. Tanner must bill 40 hours a week. Despite Mr. Tanner's refusal to do so, TEG fraudulently invoiced the SAIC contract for Mr. Tanner's work.

106.    Don Engel is an independent graphic artist and designer.  TEG knowingly inflated Mr. Engel's qualifications in order to bill him at a higher rate.  Despite having informed Clare that he did not have a Bachelor's degree, TEG claimed on the rate sheet that Mr. Engel had a "Bachelors degree and 12 years of relevant experience."

107.    TEG improperly billed 40 hours a week of Mr. Engel's time to the SAIC contract. At this time, however, Mr. Engel was performing tasks unassociated with the SAIC contract and the NRO, such as the creation of marketing materials for internal research and development projects.

108.    In addition, TEG's November 2015 status report to SAIC falsely claimed that Dienes and Jeffrey LeBlanc were TEG employees who would be added as contract performers. Dienes is the founder and President of Hadron and Mr. LeBlanc was a Hadron subcontractor at the time and is currently a Hadron employee.  Neither has ever been employed with TEG.

## C.    TEG Defendants Fraudulently Delivered Products to the Government

109.    TEG Defendants knowingly invoiced the Government for delivery of ACES operational systems that were built by Hadron as nonoperational, demonstration prototypes.  In doing so, TEG misrepresented its authority and ability to deliver such systems and provided the Government with unlicensed, proprietary software.

110.    In and around February 2016, TEG Defendants approached Hadron about a business opportunity with JSOC for a military exercise scheduled for May that would make for a useful demonstration of ACES' capabilities.  Hadron worked diligently at its Massachusetts office and at its own expense to design, assemble, and install systems at two JSOC facilities.

111.    Hadron's system design document for this work expressly provided that Hadron retained ownership of the equipment, and that these were demonstration systems, temporarily deployed for purposes of the event, to be returned to Hadron following the exercise.

112.    TEG Defendants had counseled Hadron to leave the systems at JSOC to improve the chances of selling Hadron's product.  Unbeknownst to Hadron, however, TEG had already been awarded a federally funded contract to perform these services for JSOC, FAA4600-12-D-900, valued at $399,753, and failed to compensate Hadron.

113.    Clare subsequently represented that TEG intended to deliver these systems for use in a deployed, operational environment.  Clare was aware that these demonstration systems had not been designed for such purpose.

22

114.    In addition, TEG also improperly invoiced UNO for the hardware that Hadron had built and installed for the demonstration space located there, which TEG did not incur the expense for but, rather, the majority of which was done at Hadron's own expense.

115.    Similarly, in and around June 2016, TEG Defendants knowingly delivered to the NRO Hadron-owned property and propriety software that TEG had no right or authority to license or sell.

116.    TEG Defendants represented to Hadron that the NRO was interested in an enterprise-wide, multi-location deployment of ACES, and that a small-scale demonstration system would let the NRO evaluate ACES prior to purchasing.

117.    The installation of the ACES demonstration system for the NRO included 12 large displays, over 15 computers utilized for various purposes, and over a dozen network devices.  This hardware, acquired at Hadron's own expense, was to be part of an experimental deployment and ownership was retained by Hadron.  Hadron's Praxis™ or Photon™ proprietary software was also installed on the equipment.

118.    At no time did Hadron license to TEG the right to sell, license, or otherwise distribute Hadron's proprietary software.

119.    TEG ultimately improperly invoiced the NRO for Hadron's equipment and failed to reimburse Hadron.  Further, Hadron's equipment contained Hadron's proprietary Photon™ software and, thus, TEG sold the NRO an unlicensed, unauthorized copy of Hadron's proprietary Photon™ software.

**D.      TEG Defendants Knowingly Misrepresented TEG's Ability to Deliver an ACES Operating Environment to the Government**

120.    On or about November 16, 2016, Clare traveled to Hadron's Cambridge, Massachusetts office to meet with Dienes, Hadron's founder.  At that meeting, Hadron delivered to Clare a cease and desist letter wherein Hadron reiterated that TEG was prohibited from using or distributing any data or equipment related to Hadron's products.

121.    In an attempt to fulfill the deliverables it promised to the Government, TEG Defendants shared Hadron's product designs with other Hadron competitors in an effort to reverse engineer Hadron's products and to otherwise exploit Hadron's intellectual property.

122.    TEG Defendants have improperly used and modified proprietary system designs and proposals originally authored by Hadron for customer-specific use cases, by improperly replacing Hadron's product names with those of a competitor, Oblong Industries.

123.    TEG continues to attract federally funded investments to ACES through ongoing demonstration of Hadron's proprietary technology at the ACES Rosslyn Lab.  Yet, unable to deliver Hadron's proprietary technology, TEG has used a large portion of the federal funding it has been awarded for its personal gain and use to support its efforts to reverse-engineer Hadron's proprietary products, rather than on the actual deliverables promised the Government in the procurement process.

**E.      TEG Defendants' False Misrepresentations Concerning TEG's Ability to Deliver a Cross Domain Solution to the Government**

124.    TEG Defendants improperly obtained federally funded investments designated to ACES by knowingly misleading the Government.  They did so by falsely demonstrating Hadron's proprietary and SBIR-derived products as TEG's own, by touting the names and

expertise of Hadron's staff, and by misleadingly passing off language drafted by Hadron to describe Hadron's vision for ACES as that of TEG.

125.    Currently, as a result of TEG Defendants' misrepresentations and misconduct, all ACES funding is being directed to TEG via a sole source contract award with a ceiling of $49,490,000.00 ("Sole Source Contract") despite TEG's general lack of technical engineering expertise and specific lack of experience building the ACES system.

126.    The Sole Source Contract is ostensibly for a non-ACES service, namely a cross domain solution ("CDS").  The published Notice of Intent to Sole Source focused on the delivery of a CDS, and the published Justification & Approval touted TEG's expertise in CDS, and none of the published acquisition documentation mentioned anything regarding an ACES-like capability.

127.    In actuality, however, TEG secured the award of the Sole Source Contract from the Government for a product whose description was a verbatim match of the products and services for which Hadron was, through its SBIR Phase III rights, the Government's preferred vendor, i.e., ACES.  In fact, TEG submitted text for the supporting acquisition documents that was originally authored by Hadron to describe its original vision of ACES, and is the same language that TEG reused in Government proposals, statements of work, and task orders for Hadron's development of ACES.

128.    TEG Defendants misrepresented and obscured the nature of the product and services to be provided to the Government in order to secure the Sole Source Contract for TEG worth $49,490,000.00, and to conceal the fact that TEG had no experience in providing a CDS.

129.    In order to secure this federal funding from the Government, TEG Defendants intentionally and improperly conflated TEG's CDS product, a nascent internal project with no

track record and no prior funding, with ACES, a successful program that several DoD components were already funding.

130.    In this regard, TEG falsely stated, inter alia, that:  its CDS had received funding that had actually been awarded to ACES; its CDS software was undergoing an accreditation process that actually applied to ACES; and its CDS had been used in a national security military exercise that, in truth, only featured ACES.  TEG also plagiarized Hadron's ACES marketing language to describe its CDS products.

131.    TEG has no experience building CDS products, and TEG Defendants have fraudulently caused the Government to pay tens of millions of dollars of federal engineering funds for national security-critical tools to TEG, a company with no skills to deliver any of these crucial products.

### a.    TEG Defendants' False Statements Concerning CDS

132.    A CDS is a network product that governs the flow of information between differently classified networks.  For example, in environments where a Top Secret network connects to a Secret network, a CDS would allow information to flow from the Secret network to the Top Secret network and allow Secret and Unclassified information to flow from the Top Secret network to the Secret network.  However, a CDS must never allow Top Secret information to be transmitted to the Secret network.

133.    A defective CDS would cause exceptionally grave harm to national security, and pose life-threatening danger to tactical users.  CDS products safeguard the nation's intelligence and its sources.  When deployed in theater, these products safeguard the identities, whereabouts, and intentions of American service members and intelligence personnel.  There exists a well

established market of CDS products, which are complex, expensive, and take years to develop and test.

134.    In and around June 2015 and November 2016, TEG delivered multiple briefings to Government audiences claiming that it produced two CDS products:  Lazarus and Phoenix. TEG falsely claimed that Lazarus had been under stable development for 15 years and was widely deployed across the United States Intelligence Community at over 60 different locations. According to TEG, Phoenix was a new CDS product having the same capabilities of Lazarus, but in a small form factor made specifically for tactical applications.

135.    In these briefings, TEG further claimed that Lazarus and Phoenix used a unique software architecture that made them superior to all other CDS products available.

136.    TEG Defendants produced an alternative version of these briefings that contained USAF branding and were provided to their contacts at A2I for purposes of attracting additional Government funding for TEG's CDS products.  These USAF branded CDS briefings falsely claimed that TEG's CDS products were funded USAF innovation projects.

137.    Contrary to its misrepresentations, TEG has never delivered an operational CDS to any customer.  TEG only first began engineering work on Lazarus in August 2015, six months before TEG Defendants began falsely representing to Government audiences that TEG's Lazarus CDS product was operational in 2001 and was deployed at 62 locations.

138.    When briefing Government staff on the product roadmap for Phoenix, TEG provided a planned feature list that was actually a list of existing features in an already established tactical CDS product, CenturionCDS, produced by a competitor, Advatech Pacific Inc., whose marketing materials TEG plagiarized for use at its briefings to the Government.

139.    From August 2015 through August 2016, just two months before TEG was awarded the Sole Source Contract, TEG's entire CDS software engineering effort was performed by a single individual, John Glenn Weed ("Weed").

140.    Prior to his affiliation with TEG, Weed was a cybersecurity engineer at The Analytic Sciences Corporation ("TASC") and had developed a CDS for national security customers.  In or about August 2015, TEG subcontracted Weed to recreate the work he had done for TASC to create a TEG branded product.

141.    Notably, a contemporaneous white paper published by A2I expressly set forth that "designing a CDS from scratch" as TEG was actually doing "is not advisable."

142.    In October 2016, TEG was awarded the $49,490,000.00 Sole Source Contract to deliver its CDS products to the Government based on TEG Defendants' false statements concerning the unique architecture of TEG's CDS products, purported long development history, and popularity within the national security community.

b.    **TEG's Delivery of Defective CDS**

143.    In or about August 2016 and prior to the award, Clare and McCluskey were aware of multiple warning signs that the capabilities of TEG's CDS products failed to meet the claims they had been making to the Government.

144.    Up through August 2016, Weed was the only individual performing software engineering work on TEG's CDS products.

145.    On or about August 5, 2016, Weed was suspended from federal contracting by the USAF Deputy General Counsel, citing inter alia, "a lack of business integrity or business honesty that seriously and directly affects his present responsibility to be a Government contractor or subcontractor."

28

146.     Weed's suspension stemmed from a periodic review of his security clearance in 2012 wherein he failed to report a third Driving Under the Influence conviction.  The resulting investigation led the FBI to discover Weed violated strict security rules at the NRO, had been sending encrypted communications to his home computer from his NRO computer, and stole hundreds of thousands of dollars worth of Government equipment.

147.     During a meeting on or about August 17, 2016, Clare inquired whether Sam Hartman, a Hadron engineer and former director of the Internet Engineering Task Force's security area, could assist TEG with its CDS engineering efforts.  Upon learning about the products, Mr. Hartman warned against deploying a CDS architected in the manner described, noting that transporting digital video across a CDS without reencoding could get service members killed.

148.     In or about September 2016, TEG retained an engineer, Michael Hatcher ("Hatcher") to take over Weed's development of CDS following his suspension.  Upon his evaluation of Weed's work, Hatcher informed Clare and McCluskey that the work Weed had done could not be characterized as real engineering or programming and there was no protection in the code against network attacks.  Another engineer retained by TEG, Kevin Greeley, concurred that the work should not be salvaged.

149.     Despite these warnings, TEG Defendants nonetheless continued to pursue the sale of TEG's CDS, choosing instead to make improvements in the long term so as not to endanger the impending Sole Source Contract award.

150.     TEG Defendants were acutely aware that, if deployed operationally, these CDS products would pose life-threatening danger to United States service members and intelligence personnel.

151.    Knowing the defective nature of the CDS products, TEG Defendants took no immediate action to prevent the Government's purchase of these defective goods.

152.    TEG Defendants continued to deceive the Government to secure the $49,490,000.00 award while knowing and privately acknowledging TEG's inability to build or manage a CDS product.  TEG Defendants intended to use the federal funds from the Sole Source Contract to "get their skills straight" and would, in the meantime, maintain the illusion of an effective product.

153.    As of September 2017, $20,800,000.00 of the $49,490,000.00 ceiling of the Sole Source Contract had been awarded.  Upon information and belief, some of this amount is funding non-CDS A2I investments, unrelated to the scope of the Sole Source Contract.

## FIRST COUNT
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

154.    Relator incorporates the allegations contained in Paragraphs 1 - 153 of this Complaint as if fully set forth herein.

155.    Through the acts described above, Defendants, through their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the United States false and fraudulent claims in order to obtain payment from the United States and its contractors, grantees, and other recipients of its funds.

156.    In each of these claims, Defendants overcharged the United States and made express or implied representations regarding material terms of the underlying contracts, including as to their respective abilities to perform the functions required.

157.    The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, their agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

158.    By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered millions of dollars in damages and continues to be damaged.

159.    The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act, 31 U.S.C. §§ 3279 - 3233, as amended.

**SECOND COUNT**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

160.    Relator incorporates the allegations contained in Paragraphs 1 - 159 of this Complaint as if fully set forth herein.

161.    Through the acts described above, Defendants, through their agents, employees, and co-conspirators, knowingly made, used, or caused to be made or used, false records and statements material to their false claims during their negotiations of the respective contracts and during performance of the contracts by providing materials, products, and services to the United States that they were unqualified, unable, or legally permitted to provide.

162.    Defendants' false statements and records were material to their false claims as they had a natural tendency to influence and were capable of influencing the United States to make payments that, absent the falsity, it may not have made.

163.    Defendants, individually or through their respective management officials, knew these statements were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts described above.

31

164.     As a result of the false statements and records made or caused to be made by Defendants during negotiations and during performance of the respective contracts, the United States was damaged in an amount to be determined at trial.

165.     The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act, 31 U.S.C. §§ 3279 - 3233, as amended.

## THIRD COUNT
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

166.     Relator incorporates the allegations contained in Paragraphs 1 - 165 of this Complaint as if fully set forth herein.

167.     Through the acts described above, Defendants, through their agents, employees, and co-conspirators, knew or became aware of the material false claims and statements the Defendants had made under the respective contracts.

168.     Nonetheless, Defendants concealed this knowledge and made no disclosures to the United States of their materially false and inaccurate claims and statements.

169.     By concealing their knowledge of these falsities, each Defendant knowingly concealed and improperly avoided obligations to pay or transmit funds to the Government, namely the overpayments stemming from their false disclosures, certifications, and statements.

170.     As a result of Defendants' knowing concealment and improper avoidance, the United States was damaged in an amount to be determined at trial.

171.     The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act, 31 U.S.C. §§ 3279 - 3233, as amended.

**FOURTH COUNT**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

172.     Relator incorporates the allegations contained in Paragraphs 1 - 171 of this Complaint as if fully set forth herein.

173.     Through the acts described above, each Defendant agreed, expressly or implicitly, to work with one another to submit or cause to be submitted false claims and false records, and made or caused to be made material false statements in order to illicit payments from the United States for products and/or services Defendants could not provide.

174.     As a result of Defendants' agreement, overt actions, and for any party to voice concern of the material blatant False Claims Act violations that occurred, the United States was damaged in an amount to be determined at trial.

175.     The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act, 31 U.S.C. §§ 3279 - 3233, as amended.

**REQUEST FOR RELIEF**

WHEREFORE, *qui tam* Plaintiff and Relator Hadron Industries, Inc. requests judgment as follows that:

1) Defendants cease and desist from violating 31 U.S.C. §§ 3279 - 3233;

2) The Court enter judgment in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the FCA, as well as a civil penalty of $21,563 for each violation of 31 U.S.C. § 3729;

3) Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

4) Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5) Such other legal or equitable relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Dated:  April 30, 2018                    RESPECTFULLY SUBMITTED,


                                    By:___/s/   Thomas J. Finn_____
                                          Thomas J. Finn  (BBO # 561346)
                                          tfinn@mccarter.com
                                          Paula Cruz Cedillo (BBO # 671443)
                                          pcedillo@mccarter.com
                                          Nicholas W. Allen (BBO # 663409)
                                          McCARTER & ENGLISH, LLP
                                          265 Franklin Street
                                          Boston, Massachusetts 02110
                                          Telephone: 617.449.6500
                                          Facsimile:  617.326.3106

                                          Alexander W. Major
                                          amajor@mccarter.com
                                          Franklin C. Turner
                                          fturner@mccarter.com
                                          McCARTER & ENGLISH, LLP
                                          1015 15th Street, NW
                                          12th Floor
                                          Washington, DC  20005
                                          Telephone: 202.753.3400
                                          Facsimile:  202.296.0166

                                          Attorneys for *Qui tam* Plaintiff
                                          and Relator Hadron Industries, Inc.